This action was to recover damages occasioned by the death of the plaintiff's intestate, which was alleged to have been caused by the negligence of the defendant. The defendant owns and operates a railroad running from Owego to Ithaca. It was built in 1849. Before its construction a *Page 214 
highway existed leading from the Coddington road across the valley of the Six Mile creek to the Catskill turnpike. The railroad was constructed across this highway which was cut down about twenty-two feet below its surface, and the defendant erected a bridge over the cut. From the time the bridge was erected until the accident, so far as repaired, it was repaired by the defendant. During that time it erected one or two new bridges in place of an old one, and repaired them several times. At the time of the accident, the bridge was a wooden structure about sixty-eight feet in length, the center panel was seventeen and one-half feet in the clear, and the floor or roadway, which consisted of plank three inches in thickness, was laid upon four stringers, twelve inches square, bolted to and which apparently formed a part of the framework. An accurate model and diagram of the bridge used on the trial was produced on the argument of this appeal.
On the twelfth of November, 1898, the plaintiff's intestate was in the employ of John Lee, the owner of a traction engine and separator, who was engaged in threshing for farmers in that locality. In passing from the place where they had been at work to another where they had been engaged to thresh, they passed over a portion of this highway and attempted to cross the bridge. The engine was ten horse power and weighed about seventy-five hundred pounds. It was light of the kind used for that purpose, the usual weight being several thousand pounds greater. The separator attached to the engine at the time they attempted to cross weighed about thirty-nine hundred pounds. Before crossing, the owner and the plaintiff's intestate examined the bridge to ascertain whether or not it was safe. They also inquired as to its safety of the pathmaster of the district in which it was located, who expressed the opinion that it was safe, although he suggested that they should not rely upon his opinion. They ran onto the bridge carefully, keeping the wheels of the engine and separator over the sleepers, passed over about twenty-six feet of the bridge before reaching the center panel, and when the engine reached that part of the bridge two of the sleepers *Page 215 
gave way, precipitating the engine, separator and men to the railroad below. The plaintiff's intestate was instantly killed.
The negligence charged was that the defendant failed to keep this bridge in a reasonably safe state of repair. It was also alleged that such negligence was the cause of the intestate's death, and that he was free from any negligence which contributed to his injury. The proof disclosed, without contradiction, that the two stringers which gave way had remained in the bridge nine years and were extremely rotten. The rot was internal, leaving the outside apparently sound. Their actual condition could be ascertained by boring into the ends, or by in some way reaching beyond the surface. There was a shell from an inch to two inches in thickness on the outside which was sound, but the remainder was entirely decayed. The condition of the bridge was fully described, and the evidence tended to show that the defendant was negligent in not properly maintaining it. There was also proof of freedom from contributory negligence by the plaintiff's intestate. The questions of the defendant's negligence, the freedom of the plaintiff's intestate from contributory negligence, and the amount of damages were questions for the jury, and its verdict was justified, unless the statutes, which will be subsequently considered, control and render it improper. The only questions before this court for review are those presented by exceptions to rulings and to the charge of the trial court.
The plaintiff was permitted to prove by one of the defendant's witnesses, who was employed by it to construct and repair such bridges, the length of time it left hemlock planking upon such a bridge before renewing. The evidence was objected to as improper and incompetent. The objection was overruled and the defendant excepted. The witness testified that planking would generally wear out before it would rot out on a bridge where there was a great deal of travel, and that upon the bridge in question it would last five years as a rule. He was then asked if that was true as to the stringers, and replied they would, as a rule, last five or six years. This *Page 216 
evidence was admitted under the same objection and exception. The appellant now insists that the question for the jury was whether it was negligent to permit exposed hemlock stringers to remain in this bridge nine years without change, and that it was error to permit the plaintiff to prove its custom in that respect. We think the evidence given by the witness was proper, as it tended to show an omission of duty on the part of the defendant by permitting the sleepers which gave way to remain long after their usual life without sufficient or thorough inspection.
It is also urged that the time within which hemlock timber would decay is not so far a question of science or skill as to justify the reception of expert testimony upon that subject. We are of the opinion that the experience of the witness in testing the life of the hemlock used in that locality gave him a knowledge of the subject which rendered it competent to prove by him how long such timber would last. A witness who has been for years engaged in the erection and maintenance of bridges or other similar structures, and thus by experience has ascertained the life of a particular wood grown in the locality, may properly be permitted to testify to the knowledge thus acquired. The evidence elicited was not an opinion, but proof of a fact which the witness had ascertained by his long experience in the business in which he was engaged.
Another exception upon which the defendant relies was to evidence that after the accident four or five sleepers were put in place of the two which were broken. This evidence was not admitted upon the theory that it was proof bearing upon the question of the defendant's negligence or an acknowledgment of it, but the ruling was placed upon the express ground that it contradicted the testimony of the defendant's witnesses as to the strength of the bridge after the accident, who in effect had stated that it was the same after as before. As this proof was admitted simply to contradict those witnesses, and as it was expressly limited to that purpose by the learned trial judge, it was clearly admissible. *Page 217 
Again, the appellant earnestly insists that section one hundred and fifty-four of the Highway Law is a bar to any recovery in this action. This contention seems to be based upon the theory that that section is applicable to the facts in this case, and hence, conclusively established that the plaintiff's intestate, as a matter of law, was guilty of contributory negligence. That section provides: "No town shall be liable for any damage resulting to person or property, by reason of the breaking of any bridge, by transportation on the same, of any vehicle and load, together weighing four tons or over; but any owner of such vehicle or load, or other person engaged in transporting or driving the same over any bridge, shall be liable for all damages resulting therefrom." (L. 1890, ch. 568, § 154.)
The engine upon which the plaintiff's intestate was riding, together with the separator, weighed more than the amount mentioned in the statute. There was, however, no sufficient proof that either the engine or the separator weighed that amount, but on the contrary it was that the engine weighed about seventy-five hundred pounds and the separator about thirty-nine hundred pounds. Nor was it shown that the forbidden weight was upon the portion of the bridge which gave way at the time of the accident. The thresher could not have been upon that particular bent or panel at the time. The panel was only seventeen and one-half feet in the clear, while it was more than nineteen feet from the front wheels of the engine to the front wheels of the separator, so that it is plain that at no time was there upon the broken bent a weight equal to that forbidden by the statute, and hence it cannot be said that the breaking of the bridge was caused by the transportation over it of a load exceeding four tons. The testimony also disclosed that if the stringers had not been rotten they would have sustained a weight of more than thirty tons.
The duties of railroad companies in building and maintaining bridges which are rendered necessary by their interference *Page 218 
with existing highways are defined and regulated by another statute which declares: "Every railroad corporation which shall build its road * * * across * * * any highway * * * which the route of its road shall intersect or touch, shall restore * * * the * * * highway * * * thus intersected or touched to its former state, or to such state as not to have unnecessarily impaired its usefulness, and any such highway * * * may be carried by it, under or over its track, as may be found most expedient." (L. 1890, ch. 565, § 11.) It has been many times held that the statutory duty of restoring a highway appropriated by a railroad company for its track is a continuing obligation incident to its franchise; that the purpose of the statute was to impose upon the company the duty of maintaining a bridge or highway as well as of restoring it, and that the statutory duty to preserve the usefulness of the highway attaches and remains until it is fully complied with. (Allen v. B., R. P. Ry. Co., 151 N.Y. 434.)
In considering these statutes the first question presented is whether the statute, exempting a town from damages resulting from the breaking of any bridge by a load weighing more than four tons, applies to a bridge maintained, not by a town or at public expense, but constructed by a railroad company in pursuance of the provisions of section eleven of the Railroad Law.
Section one hundred and fifty-four of the Highway Law relates only to bridges maintained by towns, and does not in terms nor by implication apply where railroads have appropriated to their own use absolutely safe highways and in place erected bridges for the accommodation of the public. Section eleven of the Railroad Law as it now exists is merely a codification or continuance of the earlier statutes upon that subject which required railroad companies to restore highways appropriated by them to their former state, and it was not changed, altered or repealed by the statute relating to the liability of towns.
Examining the Highway Law, it seems plain from its context *Page 219 
that section one hundred and fifty-four was intended to apply only to town bridges maintained at public expense. Section one hundred and fifty-three provides that whoever shall injure any bridge maintained at public expense in the manner specified shall forfeit treble damages. Immediately following is the section quoted, thus showing that the bridges which were in the legislative mind when this statute was drawn and to which that section was intended to apply, were bridges of a town maintained at public expense. The Railroad Law and the Highway Law were passed upon the same day. Section eleven of the Railroad Law defines the duties of railroad companies, while section one hundred and fifty-four of the Highway Law relates only to highways and bridges maintained by towns. It seems manifest that that section of the Highway Law was not intended to apply to or to abridge the rights of the public as against railroad companies, nor to lessen their liabilities in regard to the character of the bridges they are required to build and maintain where they appropriate a portion of a highway. Section eleven of the Railroad Law was not repealed by the Highway Law. There was no direct repeal, and it was not repealed by implication. The intention to repeal a statute by implication will not be presumed, nor the effect of repeal be admitted, unless an unavoidable inconsistency in the statutes exists, and then only to the extent of the repugnancy between them. Nor is one statute to be considered as repugnant to another unless they relate to the same subject and are enacted for the same purpose. (Sutherland on Statutory Construction, § 138; Davis v. SupremeLodge Knights of Honor, 165 N.Y. 159, 164 et seq.) Therefore, section eleven of the Railroad Law is still in force, unamended, and unaffected by the statute limiting the liability of towns.
But it is said that section one hundred and fifty-four of the Highway Law indicates a policy limiting the liability for injuries occurring upon the bridges of the state, including those erected and maintained by railroads as a compensation to the public for portions of highways they have destroyed. *Page 220 
To justify us in upholding the policy contended for, some sufficient reason must be found. Upon what, then, can such a conclusion be based? Evidently not upon the language of the statute, as it contains none indicating any such purpose; not upon any known or existing intent of the legislature, as we find nothing to indicate any such intent; not upon any previous law, as none is found indicating such a policy. The question of public policy has been somewhat discussed by this court, and the cases in which courts are justified in considering it when called upon to enforce the law have been quite clearly stated. As to the power of the court to adopt any such supposed policy, it has held that it should be exercised only in clear cases, and generally within limits previously defined, and that the legislature is the authority which should define any such policy which is supposed to exist. (Cross v. U.S.T. Co., 131 N.Y. 343.)
When we examine the history of the Highway Law in relation to bridges of towns, and also the law requiring the construction and maintenance of bridges by railroad companies where they have interfered with existing highways, it quite clearly indicates the policy of the state as it has hitherto existed. Anterior to 1881, neither at common law nor by statute were towns under any legal liability for damages to persons or property injured by defects in highways, although the injury was the result of the neglect of its officers to keep its highways or bridges in a safe state of repair. (Monk v. Town of New Utrecht, 104 N.Y. 552; Peopleex rel. Loomis v. Bd. Town Auditors, 75 N.Y. 316; People exrel. Van Keuren v. Bd. Town Auditors of Esopus, 74 N.Y. 310.) The only remedy that then existed was an action against the commissioners of highways. But even such an action could not be maintained unless the officers whose duty it was to repair them had sufficient funds in their hands to remedy the defect and still omitted to do so. (Hover v. Barkhoof, 44 N.Y. 113.) Therefore, if a town omitted to raise sufficient funds to keep its bridges and highways in repair, a person injured was compelled to bear any loss he might suffer, *Page 221 
as he could recover against neither the town nor its officers. Towns in their corporate capacity had no control over highways, and were under no obligation to keep highways or bridges in repair. Neither was an overseer nor commissioner of highways an agent of the town, and, hence, it was not chargeable for his nonfeasance or misfeasance or for his official acts or delinquencies. (People ex rel. Van Keuren v. Bd. TownAuditors, 74 N.Y. 310.) The practical working of the law as it then existed was that when a recovery was had against a commissioner, an effort was at once made to induce the town to pay the judgment and relieve the commissioner, which was usually successful. In 1881, while this was the condition of the law, the legislature passed a statute providing that towns should be liable for all damages to persons or property by reason of defective highways or bridges in cases in which the commissioners of highways were liable, and made the judgment recovered for any such damages a charge upon the town. After having thus imposed upon towns this new liability, the statute under consideration was passed evidently for the purpose of modifying or mitigating the effect of the law of 1881, and to some extent relieving towns from the liability which had been thus imposed. But since 1835 the liability of railroad companies for injuries occasioned by their neglect to restore and maintain highways crossed by their railroads to their former state so as not to impair their usefulness, has never been questioned nor denied. And never until now has it been claimed that the policy of the law relating to bridges or highways of a town had any application or relation to the duties and liabilities of railroad companies imposed by the Railroad Law. The policy as to each has always been distinct and essentially different from that which has been adopted as to the other. Consequently, when the legislature determined to relieve the towns to some extent from the liability which had been imposed upon them by the statute of 1881, the act under consideration was enacted to accomplish that result. But the fact that it thus sought to relieve the public from damages for injuries caused in the manner pointed out, in no way discloses *Page 222 
any general or special policy which can be properly applied to railroad bridges built in pursuance of the Railroad Law, which clearly defines the duties of such companies.
If the broad claim of the appellant is sustained, it would seem to follow that section one hundred and fifty-four may also be held to apply to toll and other highway bridges owned and maintained by individuals or other private corporations, and also to bridges in the cities and villages of the state. But as this statute is, by its provisions, limited to the liability of towns, we think it ought not to be extended beyond its plain and apparent purpose, and thus interfere with or destroy existing rights and liabilities, especially where it may essentially interfere with the rights of the public, which are conferred upon it by a statute that has neither been repealed nor modified. The manifest object of the amendment of the Highway Law was to relieve towns from certain liabilities, but not to lessen or absolve railroad companies from the duty imposed upon them by another statute. While sufficient reasons may have existed to induce the enactment of a statute limiting the liabilities of governmental corporations or political divisions of the state for which the public is responsible, still, none is obvious which would have induced the legislature to modify or repeal the statutory liabilities and duties of railroad companies. If any such reasons had existed, it is fair to assume that the legislature would have given them expression by extending the limitation to railroad bridges, and would not have confined them to those maintained by towns. It is to be presumed that the legislature did not intend to make any changes in the existing law beyond what is expressly declared. (Sutherland on Statutory Construction, § 333.)
What is now asked is that the court shall, in effect, repeal a statute which has existed for half a century, been continued by the legislature notwithstanding the amendment of the Highway Law, and to practically extend another statute, which is applicable only to towns, to other corporations and other subjects which were never intended to be included. That the power we are asked to exercise is legislative and not *Page 223 
judicial, is manifest. By no proper rules of interpretation can this statute be extended to cover bridges erected in pursuance of the Railroad Law. Indeed, it is not even claimed by the appellant that the statute has any such effect in and of itself, but the court is asked to extend its effect to cases which were never contemplated by the legislature, upon the ground that it has in some incomprehensible way inaugurated a policy which the courts should enforce by thus extending it to railroad bridges. If this relief is necessary or even proper, the statute should not be amended or extended by this court, but the remedy is with the legislative branch of the government. If the courts can extend this statute to bridges maintained by railroad companies in towns, they may as well extend it to railroad bridges in cities and villages, without regard to the length of the bridge, its location, or the character of the traffic over it. Thus, followed to its logical result, it would destroy or seriously cripple many of the great and important industries of our cities and villages. Street car lines, transportation companies and individuals engaged in moving heavy articles would be compelled to discontinue their operations, suspend their business, reduce it to an impracticable or impossible limit, or become their own insurers while crossing bridges of railroad companies which have appropriated the street under a statute requiring them to restore it to its previous state. Legitimately this court possesses no such power. Section one hundred and fifty-four was intended to apply only to bridges maintained by towns at public expense where the streams and creeks over which bridges are built are usually small and easily forded. In such cases the statute would not be liable to operate oppressively upon those who are required to transport heavy machinery or other heavy loads over such highways and bridges. But to extend it to railroad bridges over which the traveling public are required to cross and which can seldom be avoided except by traveling great distances might prove oppressive and was not within the purpose of this statute. Nor does it indicate any policy which would justify us in holding any such doctrine. *Page 224 
In 1897 the legislature passed an act amending the Railroad Law in relation to grade crossings, which provides that all steam surface railroads thereafter built should be so constructed as to avoid public crossings at grade when practicable (§ 60); that when a new street or highway shall be constructed across such road, it shall pass over or under such railroad or at grade as the railroad commissioners shall direct, the manner in which existing crossings may be changed, and how lands to carry out the provisions of the statute as amended may be acquired, and then follows this provision: "When a highway crosses a railroad by an overhead bridge, the framework of the bridge and its abutments shall be maintained and kept in repair by the railroad company, and the roadway thereover and the approaches thereto shall be maintained and kept in repair by the municipality in which the same are situated." (L. 1897, ch. 754, § 64.) Although some doubt has hitherto existed whether this statute has any application to existing crossings where no change of grade has been made or is intended, still, while the general purpose of that statute was to prevent and remove railroad crossings at grade so far as practicable, yet, as the language of the statute is sufficiently broad to include existing bridges, we have held that it applies to such bridges, and the question is not an open one in this court. (City of Yonkers v. N.Y.C. H.R.R.R. Co., 165 N.Y. 142. )
On the trial, as well as upon the argument of this appeal, the appellant insisted that by virtue of this statute the duty of maintaining the roadway upon this bridge rested upon the town of Ithaca; that the broken stringers were a part of the roadway; that no duty to see that they were in proper repair rested upon the defendant, and, hence, that an action for negligence in permitting them to remain in the bridge without proper inspection did not form any basis upon which the jury was justified in finding it guilty of negligence. This question is presented by an exception to the charge of the learned trial court. The defendant requested it to charge if the jury found that the death of the plaintiff's intestate was the result of a defect and giving way of the roadway to the *Page 225 
bridge, then the plaintiff could not recover. To this request the court replied: "I so charge, but I charge you that the stringers were a part of the framework of the bridge." The defendant thereupon excepted "to that part which holds as matter of law that the stringers were a part of the framework."
Upon the trial, as we have seen, a model of the bridge was in evidence and was exhibited to the court and jury. Proof was given as to the manner in which the bridge was constructed, describing particularly the stringers, the materials employed, how they were fastened to the bents and a full description of the manner in which the whole bridge was constructed, including several maps or diagrams which showed plainly the entire details.
The defendant called as a witness Henry Jacobie, who testified that he was a professor of bridge engineering which involved bridge construction; that he had been engaged in teaching that profession for nine years and one-half; had taught civil engineering previously, and during his life had been more or less engaged in some work in relation to bridges. He had never constructed any, but had seen their construction and had studied and taught the theory. He then testified that in a bridge of the type of that in question the roadway was understood to be the planking of the floor, the stringers sustaining it and the handrail. Thus the question presented is whether the court was justified in charging that the stringers were a part of the framework of the bridge, and if not whether it constituted an error requiring a reversal of this judgment.
It is quite obvious from an examination of the model, the diagrams and the description of the manner in which the stringers were fastened to the other framework of the bridge, that the stringers were included in and were a part of what would naturally and ordinarily be understood as its framework. In construing this statute, it was the duty of the court to give to its words their plain, usual and ordinary meaning. Giving to those words that meaning, it is obvious that the stringers in this bridge were a part of the framework and not a part of the roadway, notwithstanding the fact that they *Page 226 
might convey a different meaning to the scientific mind. We think it was so plainly the intent of the legislature that the railroad company should construct the entire framework of the bridge, that the court was justified in holding that the stringers were a part of the framework and not a part of the roadway. As a rule, questions in regard to the interpretation, construction or effect of written documents are for the court alone, and for the judge to submit such questions to the jury is error. This rule applies to all written laws, constitutional provisions, statutes, etc. (19 Am. Eng. Ency. of Law, 646, § 4.) While it is true that in some cases where peculiar expressions are used which have in particular places or trades a known and special meaning, in construing contracts between parties where there is a conflict in the evidence in regard to their peculiar meaning, it is for the jury to say what the meaning of such expressions is, or, in other words, how they were understood by the parties themselves, yet, when a statute is to be interpreted, the question is what the legislature intended, or what is the plain and natural meaning of the words employed. We find in this charge no error which would justify a reversal of the judgment.
There is another ground upon which it would seem that the defendant ought to be held liable. Even if the stringers were a part of the roadway, still, the defendant ought not to be permitted to assert as a defense to its own negligence that what it did ought to have been done by the town, especially after having furnished sleepers, which, if sound as they appeared, were sufficient to bear a weight of thirty tons, and after having permitted them to remain three or four years beyond their ordinary life without proper inspection or examination, as it thereby induced the plaintiff's intestate to pass onto the bridge to his injury, when it knew, or should have known, that it was a danger and snare to the traveler passing over it. As was said by FOLGER, J., in McMahon v. Second Ave. R.R. Co. (75 N.Y. 231,238): "By undertaking to make a safe way of passage, and failing to entirely do so, and yet making the show of a safe way, the defendant *Page 227 
misled the plaintiff to his harm and must answer to him for his damage. They had a right to do what they did, had they done it well. * * * But having begun, they were bound to do it in a proper manner for the public." (Dygert v. Schenck, 23 Wend. 446, 451.) The defendant having placed these sleepers in the bridge, and having failed to remove them or furnish others, although they became dangerous during the time it was required to maintain this portion of the bridge, the fact that the legislature subsequently imposed upon the town the duty of maintaining the roadway, did not relieve the defendant from liability for its negligence in permitting them to remain after they became rotten and worthless and were a secret danger to all who passed over the bridge.
We are of the opinion that the duty of maintaining the stringers to this bridge was upon the defendant; that it was guilty of negligence in not properly doing so, and, hence, so far as the question of the defendant's negligence is involved, the judgment should be sustained. We are also of the opinion that upon the evidence the question of the plaintiff's contributory negligence was a question for the jury.
It follows that the judgment and order appealed from should be affirmed, with costs.
BARTLETT, VANN and WERNER, JJ., concur; CULLEN, J., concurs in result; PARKER, Ch. J., and GRAY, J., not voting.
Judgment and order affirmed.